## CIRCUIT COURT OF LOUDOUN COUNTY

Commonwealth of Virginia

v.

William Evans-Smith

### Case No. (Criminal) 4700

By JUDGE JAMES H. CHAMBLIN

March 24, 1989

This case is before the Court on the Motion of the Defendant for dismissal of the indictment pursuant to Section 19.2-243 of the Code of Virginia. The Court has considered all the memoranda filed by counsel and the oral argument of counsel on March 23, 1989.

For the reasons hereinafter set forth, the Motion is denied.

Because appellate courts look at the record to determine if a defendant has been deprived of the right to

a speedy trial, *Godfrey v. Commonwealth*, 227 Va. 460 (1984); *Cantwell v. Commonwealth*, 2 Va. App. 606 (1986), a trial court must also look at the record in the case in determining the same issue. Therefore, because the transcript of the proceedings on November 4, 1988, is a part of the record under Rule 5A:7 of the Rules of the Supreme Court, it will be considered by the Court on the instant Motion as so ruled from the bench on March 23, 1989. Also, the Court ruled that Mr. Moyes would not be allowed to testify because the transcript must speak for itself. He cannot testify as to what he may have meant by the words he used on November 4, 1988, or to add anything to the transcript. *See Flanary v. Commonwealth*, 184 Va. 204, 207 (1945).

A court of record speaks through its orders, and any conflict between the contents of an order and a transcript of a trial proceeding must be resolved in favor of the court order. *Stamper v. Commonwealth*, 220 Va. 260 (1979); *Kern v. Commonwealth*, 2 Va. App. 84 (1986). Rule 1:1 allows either party a twenty-one day period in which to object if it is felt that the order is not accurate. After twenty-one days, the order becomes final and is not subject to modification, suspension, or vacation. If a matter is not covered by an order, then the Court can determine that matter based on the transcript.

The Motion raised two major issues, and each is addressed below.

I. *Do the time periods set forth in Section 19.2-243 apply to a retrial following a reversal and remand for a new trial by the Court of Appeals?*

The Commonwealth argues that the statutory speedy trial rules do not apply to such retrials citing *Vance v. Commonwealth*, 4 Va. (2 Va. Cas.) 162 (1819), and *Adcock v. Commonwealth*, 49 Va. (8 Gratt.) 661 (1851). The opinions in each of these two cases are difficult to read, but I feel that each merely shows an inclination of the court not to allow a defendant to escape a retrial by a literal application of the speedy trial statute. In each case, the spirit and reason of the statute prevailed.

Section 19.2-243 does not specifically address the retrial issue, but it does contemplate a felony prosecution on being appealed. *See* the last sentence of § 19.2-243.

There is no doubt that the speedy trial right applies on a retrial after a reversal and remand of an appellate court. *See United States v. Ewell*, 383 U.S. 116, 86 S. Ct. 773 (1966); *Cooper v. Mitchell*, 647 F. 2d 437 (4th Cir. 1981). However, I feel that if a legislature decides to embody the constitutional right to a speedy trial in a statute, then it should apply to all trials, not just the first trial. It would be absurd to hold that § 19.2-243 requires that all trials (including any retrial after a reversal and remand by the Court of Appeals) be commenced within the five or nine month time periods following the original finding of probable cause or indictment.

I am of the opinion that the applicable time period under § 19.2-243 begins to run as of the date that the Court of Appeals enters its order of reversal and remand. If a defendant is to be retried after he has appealed his prior conviction and it has been reversed, then such a defendant finds himself at the time the Court of Appeals enters its order in the same position as a defendant against whom probable cause has been found at a preliminary hearing or, if there was no preliminary hearing, an indictment has just been found against him. The West Virginia case of *State v. Moore*, 357 S.E.2d 780 (W. Va. 1987), is persuasive because of the similarity of the West Virginia speedy trial statute to § 19.2-243. The phrase in the West Virginia statute of "and remanded to a court of competent jurisdiction" does not mean a remand on appeal but bringing the accused before the appropriate court.

Because of my ruling on the second issue, there is no need to determine exactly when the nine-month period expired.

II. *Did the defendant on November 4, 1988, concur in or agree to the scheduling of the case for trial commencing on April 17, 1989, or did he waive his right to a speedy trial?*

The provisions of § 19.2-243 do not apply to such period of time, as the failure to try the defendant was caused by a continuance granted by the concurrence of the defendant in a motion by the Commonwealth. The orders entered on November 12, 1988, November 22, 1988, and December 7, 1988, clearly show that the defendant neither

objected to nor did he request setting the case for trial commencing April 17, 1989. This, however, is not a case where the defendant sat silently or passively or demanded a speedy trial. *See Flanary v. Commonwealth*, 184 Va. 204 (1945). The transcript of the November 4, 1988, hearing indicates that Mr. Moyes not only failed to object to or request the April, 1989, trial date, but he also stated that he did not desire a trial date earlier than April, 1989, (see lines 3 through 9 of page 3 of the transcript) and that it would be "fine" to so schedule the trial (see lines 11 through 14 of page 3 of the transcript).

This is not a case where the court order and the transcript are in conflict. Therefore, the court can consider the transcript of the November 4, 1988, hearing in deciding whether the Commonwealth can explain the delay. I am of the opinion that Mr. Moyes did more than merely not object and not request a trial date, but that he agreed to an April, 1989, trial date when it was suggested by the Court, and such agreement constitutes a waiver of the defendant's speedy trial right. He specifically said that he did not desire an earlier trial date. If it is not a waiver, then it is a concurrence in what must be considered as the Commonwealth's motion for a continuance from November 4, 1988, to April 17, 1989, when the trial is to commence. The case came before the Court on November 4, 1988, on the praecipe of the Commonwealth to schedule the case for trial. The legislature has set forth certain circumstances which excuse a failure to try a defendant in § 19.2-243, but that list is not intended to exclude other circumstances *in pari ratione. Knott v. Commonwealth*, 215 Va. 531 (1975). Mr. Moyes led the Commonwealth to feel that the defendant had no objection to having the case set for trial in April, 1989. He participated in setting it for trial after the Court suggested an April, 1989, date. I feel that there must be some fault shown on the part of the Commonwealth for the defendant to be entitled to a discharge under § 19.2-243. Here the Commonwealth had reason to believe that the defendant had agreed to the April, 1989, trial date and that he would not be asserting his speedy trial rights. Hence, there is no fault on the part of the Commonwealth, and it had no duty to bring about a speedy trial.

For the foregoing reasons, the Commonwealth has met its burden of explaining the delay in bringing the defendant to trial. The period from November 4, 1988, to April 17, 1989, must be excluded from the nine-month period commencing on October 20, 1987. With the additional exclusion of the period from April 11, 1988, to October 25, 1988, during which the Commonwealth's appeal of the suppression motion was pending, the nine-month period has not expired.

The Clerk will prepare an order denying the motion, to which the defendant's exception is duly noted.

July 21, 1989

On May 16, 1989, the defendant filed a Motion to Set Aside the Verdict rendered herein on April 27, 1989, and on May 25, 1989, the defendant filed a motion which started the process toward a motion for a new trial based on alleged juror misconduct.

For the reasons hereinafter set forth, both Motions are denied in their entirety. Each Motion is addressed below.

## I. Motion to Set Aside the Verdict

### A. Sufficiency of the Evidence

The defendant asserts that the evidence presented at trial is insufficient as a matter of law to sustain a conviction. The evidence against the defendant in this case is entirely circumstantial. Therefore, all the necessary circumstances proved must be consistent with guilt and inconsistent with innocence; they must create more than a suspicion of guilt, however strong, or even a probability of guilt; and they must exclude every reasonable theory of innocence. *Bishop v. Commonwealth*, 227 Va. 164, 169 (1984); *Stover v. Commonwealth*, 222 Va. 618, 622 (1981); *Inge v. Commonwealth*, 217 Va. 360, 366 (1976). Circumstantial evidence which is convincing is entitled to the same weight as direct evidence. *See Parks v. Commonwealth*, 221 Va. 492 (1980); *Mullis v. Commonwealth*, 3 Va. App. 564 (1987). The jury was fully instructed on these circumstantial evidence requirements. See Instruction No. 5.

The burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant did murder Barbara Evans-Smith (hereinafter "Barbara" or "the victim"). The Commonwealth has the burden to prove each element of the offense beyond a reasonable doubt, *viz.* that the defendant killed Barbara Evan-Smith and that the killing was done with malice.

All references herein to the facts of the case as presented at trial are based on my recollection of the evidence and the transcripts that have been prepared.

No one will dispute that Barbara Evans-Smith was murdered. The defendant denies that he committed the murder. Therefore, the central issue is whether the defendant was the perpetrator of the crime. The Commonwealth had to show that the defendant was the criminal agent beyond a reasonable doubt. A long line of cases starting with *Dean's Case*, 73 Va. (32 Gratt.) 912 (1879), and ending with *Brown v. Commonwealth*, 238 Va. 213 (1989), make it clear that those circumstances *which are proved* must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt, and those inculpatory circumstances are motive, time, place, means, and conduct. *See, Cantrell v. Commonwealth*, 229 Va. 387 (1985).

If there was ever any doubt, it was resolved in *Brown* that motive is not an element of murder even in a purely circumstantial evidence case. The Virginia Supreme Court stated:

> In keeping with our decisions that motive (as distinguished from intent) is not an essential element of murder in a direct evidence case, we have never said, *and we now expressly disavow, that motive is an essential element of murder in a circumstantial evidence case.* What we have said, and now reaffirm, is that once motive is *proved*, the underlying evidence of motive must concur with the circumstantial evidence of other inculpatory circumstances -- time, place, means, and conduct -- in identifying the accused as the criminal agent beyond a reasonable doubt. (emphasis mine).

*Brown v. Commonwealth*, 238 Va. 213 at 221. Our Court of Appeals has reached a similar conclusion when it stated:

> Although the rule as to cases based entirely on circumstantial evidence is that necessary circumstances must be consistent with guilt and inconsistent with innocence, *all of the circumstances of time, place, motive, means, and conduct do not have to be proved beyond a reasonable doubt in every case.* See *Cantrell v. Commonwealth*, 229 Va. 387, 398, 329 S.E.2d 22, 29 (1985); *McGee v. Commonwealth*, 4 Va. App. 317, 322, 357 S.E.2d 738, 740 (1987); *Mullis v. Commonwealth*, 3 Va. App. 564, 575-76, 351 S.E.2d 919, 926 (1987). Motive, for example, need not always be proved. *Cantrell*, 229 Va. at 398, 329 S.E.2d at 29. Therefore, the lack of evidence of motive in this case is not crucial. (emphasis mine).

*Stevens v. Commonwealth*, 8 Va. App. 117, 121 (1989), decided March 21, 1989.

The lack of evidence of motive is not crucial in this case. Sufficient evidence of the inculpatory circumstances of time, place, means, and conduct was presented during the trial to justify the jury finding beyond a reasonable doubt that the crime was perpetrated by the defendant. All the circumstances so proven did occur, and they were consistent with guilt and inconsistent with innocence.

### Time and Place

The Loudoun County medical examiner testified that Barbara Evans-Smith died on April 15, 1985, at approximately 6:00 a.m. give or take two hours. The medical examiner who performed the autopsy said that she died thirty to sixty minutes after the last intake of food. Although the County medical examiner opined that her body had been placed, and had not fallen, on the floor of her bedroom in the couple's home on Route 725, there was no evidence that she had been attacked and/or died outside of the home.

Evidence of the defendant's activities that morning came from statements he made to various police officers and other persons. He and Barbara had gone to bed the night of April 14th (a Sunday). He arose at or shortly before 5:00 a.m. Although he normally walked or jogged down to get the newspaper at the box at the end of the quarter-mile long gravel driveway on Route 725, he drove down in his vehicle that morning. His headlights shown upon a dark van parked on Route 725, but he saw no occupants. He and Barbara had breakfast sometime between 5:30 and 6:00 a.m. of dried peaches and toast. He left for work no later than 6:30 a.m.

The evidence conflicted as to when he arrived at work that day, but the defendant did tell investigators that he established patterns very easily. Several law enforcement officers from various jurisdictions testified to the lack of unusual traffic delays in Virginia, Maryland, and Washington, D.C., on the morning of April 15, 1985. Dorothy Lohman, a co-worker of the defendant, testified that although the defendant was often at work between 7:30 and 8:00 a.m., he was not in yet that morning at 8:45 a.m. Another co-worker, Harriet Blood, said he was there at 8:45 a.m. Other co-workers indicated he arrived, or was at the office, by 8:30 a.m.

The defendant presented no alibi evidence. His own statements placed him in the house where the murder occurred during better than one-half of the time period during which Barbara could have died. Considering death occurred within thirty to sixty minutes of eating, the defendant's own statements of when they ate breakfast placed him there during most, if not all, of that time period.

### Means

Although he may have been in his sixties, the defendant was in good physical shape. Deputies Gibson and Wright both testified that the defendant was a strong person as a result of their observations of him during the altercation at the end of the driveway on the day of the crime when the defendant wanted to see his wife's body but was denied. The autopsy showed that Barbara Evans-Smith was 5' 3" tall and weighed 145 pounds. The jury observed the defendant during the trial both sitting and standing. He

had the size and the strength to strangle his wife, especially if she was surprised by the attack. It is more likely that someone she knew rather than a stranger could have gotten close enough to her to attack her by surprise.

The cause of death was strangulation by ligature. A pair of pantyhose was found wrapped around Barbara's neck. Clearly the pantyhose was the instrument of death. Another pair of pantyhose was found on the dresser near where Barbara was found lying dead. It can be inferred that the pantyhose used to strangle her was easily accessible and available to the defendant.

### Conduct

The evidence of the conduct of the defendant during the time that death occurred has been outlined above. However, conduct of an accused following a crime is just as relevant in most cases as conduct before, particularly when its purpose is to conceal guilt. *See Pearson v. Commonwealth*, 221 Va. 936 (1981).

When informed of his wife's death by Investigators Brown and Merchant on the afternoon of April 15, 1985, the defendant's initial questions could be considered inconsistent with one who had been completely surprised at learning of his wife's unexpected death. At that time the defendant gave a different location for the dark van on Route 725 than he did when interviewed by Investigators Brown and Merchant on Wednesday, April 17, 1985. He made varying statements to different persons as to where Barbara was standing when she waved good-bye to him that morning as he left for work. There was evidence that he met with and/or spoke to friends and co-workers after the date of the offense in an effort to get them to all ascertain exactly when he arrived at work that morning. He told some persons he made no stops on the way to work, yet he told Ms. Tandler in January, 1986, that he had stopped at a car wash on the way to work.

The defendant told the investigators that he had worked on the farm all day the prior Saturday during which he cleared locust bushes. He and Barbara went to the Point to Point races at Oatlands the next day. Witnesses differed on whether they saw scratches, cuts, or bandages on the defendant's hand or hands at that time. Two officers noticed

scratches on the defendant's hands while he waited at the gate to his farm while the police investigation was taking place. A photograph of the defendant's arm taken on April 17, 1985, showed scratches that at least one doctor opined were caused by human fingernails. At the end of the driveway on the day of the offense, the defendant demanded to see his wife's body, yet when he had the opportunity at the funeral home two days later, he did not ask to see the body.

Two blood stains consistent with the blood of the defendant were found on Barbara's robe. Hairs with the same characteristics as that of the defendant were found near the right hand of the victim, from her pubic area, and on the clothing she had on when found. Blood consistent with the defendant's was found on facial tissue in the waste basket of his bedroom.

Blood consistent with the victim's was found on at least five places on her robe. Blood stained or tinged fluid was found in the victim's ear which Dr. Beyer said came from her lungs through her mouth and into the ear as she lay on the floor. The gag which had blood on it was placed in the mouth after the initial discharge. Such fluid was discharged at any time during or after the attack. It could, therefore, be the source of the blood on the victim's robe. More than one witness testified that Barbara kept an immaculate house. The photographs of the bedroom of the defendant indicate that he is a neat and organized person.

Shortly after the offense, the defendant, on several occasions, told police officers that a green or aqua colored jewel box was missing. When talking to Joe Rogers, Jr., who had been, and still was, renting a field at the Evans-Smith's farm in the latter part of April, 1985, the defendant asked that if he saw anything unusual to report it. On May 1, 1985, George Schooley, Jr., while disking the field, found the jewelry box. It was admitted into evidence, was observed by the jury, and, other than being somewhat dented by being under the seat of Schooley's tractor, it showed remarkably little wear after being recovered approximately two weeks after the offense.

The defendant attempted to show that Barbara had been killed by other persons during what appeared to be a rape and robbery. The Commonwealth contended that the

scene had been staged by the defendant. The medical examiner on the scene testified that the body of the victim had been placed, and had not fallen, where it was found. The autopsy revealed no signs of a sexual assault. No seminal fluid was found at the scene, on the victim, or on her clothes. Investigator Merchant testified that he examined the exterior of the house and found no signs of a forced entry. At the foot of the stairs leading to the second floor (the body was found in a second floor bedroom), a table was found knocked over, but resting on a drawer that was in it, resting on top of the indentations of the legs in the carpet and with an arrangement of dried flowers that was on it lying on its side, but with little or no debris on the carpet from the flowers. It appeared that the table drawer and flower arrangement had been placed, and not fallen or knocked over, where they were found.

It was raining or misting that morning. The Evans-Smith home was neat and well kept. The photographs of the interior of the house showed it to be very orderly and clean. Yet there was no blood found except on the victim's clothes, the ligature, and in the aforesaid waste basket. No dirt or mud was found tracked into the house, even in the areas leading from the unlocked kitchen door to the victim's bedroom where her body was found. One of the dogs was penned up in the laundry room, and Lesleigh Cook, daughter of the defendant and the victim, testified that she had never seen that done before. The other dog was outside. The one penned up was especially fond of Barbara.

The Commonwealth contended that Barbara was killed downstairs at the kitchen table and dragged upstairs to the bedroom where the scene was staged. The table and hutch in the kitchen area were found slightly off center, and drag marks were found on the linoleum of the kitchen floor consistent with the marks that could be made by dragging two feet. One of Barbara's slippers was found on the floor in or near the kitchen, and the other near the table at the foot of the stairs. Dr. Beyer testified that his autopsy revealed that Barbara had deep hematoma to the back of the head caused by blunt force trauma which could have resulted from her head hitting a step when being dragged up the stairs. Hairs consistent with Barbara's

were found on the stairs. There were no hairs found that were not consistent with the hairs of the defendant or the victim and which had been forcibly removed. Other hairs not consistent with either the defendant or the victim were found, but none of them appeared to have been forcibly removed.

Early on, the defendant was asked by the officers to provide a list of the items missing, but he complained that he could not do so until he had a list of what had been taken during the investigation. The evidence was not exactly clear and definite on what the defendant told the officers at various times about what he felt was missing. The jewelry boxes and jewelry scattered on the defendant's bed was almost uniformly arranged and did not appear to have been placed by an unknown intruder in a hurry.

The defendant attempted to show that one, or possibly two, horse trainers with connections to an adjacent farm could have been the assailants. The evidence as to when the two trainers, Robert Rivera and Rudy Ruiz, were at the adjacent farm (Grassy Mead Farm) that morning was conflicting. Mr. Rivera testified he was there only about forty minutes, arriving about 6:15 to 6:20 a.m. and leaving a little after 7:00 a.m. His wife, who was living with him in Charles Town, West Virginia, at the time, corroborated his testimony. They were divorced at the time of the trial. A private investigator hired by the defendant testified that Rivera had told him that he had arrived at 8:00 a.m. and was there about fifteen minutes. The same investigator testified that Rivera told him he was broke, but Rivera and his wife testified at trial that they had no money problems at that time even though he had been "ruled off" the Charles Town, West Virginia, racetrack where he had been training horses. The jury was properly instructed that evidence of a prior inconsistent statement only bears on a witness' credibility.

Rivera testified that he and Ruiz came to Grassy Mead that day to pick up a horse and take him to the track in Charles Town to work him. Even though there are security guards at the gate to the track who are required to log in each horse carrier, there was no written record of Ruiz or Rivera or the specific horse coming into the track that morning. However, Mrs. Rivera, who had plenty of

knowledge of the track, testified that it was not unusual for the guards not to make a record of every horse carrier that came into the track, especially if they were known to the guard.

There is a lack of any physical evidence to show that Rivera or Ruiz, horse trainers, who are outside and handling horses every day, were ever in the Evans-Smith home. There was no evidence that Barbara was attacked or died outside of the house. There was no evidence to link the extraneous hairs found in the house to either Rivera or Ruiz.

There was no evidence that the vehicle Rivera and Ruiz used that day was a van or similar to what the defendant said he saw on Route 725 that morning. Rivera testified that he was driving a Chevrolet Club Cab Long Truck, which is not a van in appearance. His wife said it was a pick-up truck with a gooseneck trailer, and that neither he nor any of his acquaintances had a van.

The defendant presented the testimony of Tracy Dillon about a van with Louisiana tags that pulled in front of her and failed to let her pass on Route 690 some time about 8:25 a.m. that morning. This occurred five to six miles and about ten minutes away from the Evans-Smith farm. It occurred on a road that was not the most direct route between the farm and Charles Town.

The Commonwealth presented a series of witnesses who drove on Route 725 that morning before and after the time that the defendant said he saw the van. None of the witnesses said they saw a van. The meteorological evidence indicated that the time of sunrise on that morning was about 5:32 to 5:34 a.m. A neighbor testified he went down his driveway at 6:15 a.m. and he had turned on his headlights. There was conflicting evidence concerning the tire tracks in the driveway. However, considering all the meteorological evidence, it could be concluded that the defendant only made one trip down the driveway that morning in his vehicle, and that was when he left to go to work. Evidence of one set of tire tracks was presented, and the defendant could have had his lights on when he left to go to work.

The jury observed the witnesses and all the proceedings before it in the case. The jury is the judge of the credibility of the witnesses. The jury went over all the numerous

exhibits admitted into evidence. Having heard and seen all the evidence, I am of the opinion that there was sufficient evidence presented for the jury to find under the instructions given that the defendant did murder Barbara Evans-Smith.

B. *Denial of Motion for Change of Venue*

I am still of the opinion that I was correct in denying the motion for change of venue for the reasons stated from the bench on December 14, 1987. I do not feel that any of the proceedings in this case between then and now are sufficient grounds to reverse my decision. Considering the prior history of this case, I do not feel that it took an inordinate amount of time to empanel a jury. For reasons stated below, a fair and impartial jury was empaneled for the trial of this case.

C. *Motion Pursuant to Section 19.2-243 of the Code of Virginia*

The Court's ruling on this motion will remain the same. I feel the motion was properly denied for the reasons set forth in my opinion letter of March 24, 1989.

D. *Evidence of Drug Trafficking and Conspiracy Charges of Robert Rivera*

The defendant asserts that the Court erred in not allowing him to introduce evidence at trial that Robert Rivera had been convicted of a felony drug offense in federal court in Texas and of his drug-related activities in that case. The defendant contends that such evidence was needed to identify Rivera as a possible third party criminal agent who remained uninvestigated by the police and who was shown to be connected to the crime by a series of circumstantial facts of probative value equal to or greater than those composed against the defendant by the Commonwealth.

Rivera was called as a witness for the defendant. Under Section 8.01-403, a party calling a witness cannot impeach his credit by general evidence of bad character,

but if the witness proves adverse, then with leave of Court, it may be shown that the witness made prior inconsistent statements. Evidence of criminal conviction or wrongdoing is most always offered to affect a witness' credibility. That is not the case here. This evidence was offered to implicate Rivera as the possible perpetrator, and, incidentally, to show an incomplete investigation by the police. Specifically, it was offered to show motive on Rivera's part, and, therefore, he should have been investigated sooner by the police.

The evidence admitted at trial that purports to implicate Rivera is that he was at an adjacent farm the morning of the offense with a person he had brought to Virginia from Louisiana, and that a van with Louisiana tags was seen approximately five miles from the Evans-Smith farm that morning sometime after 8:25 a.m. The evidence against Rivera is not very convincing. Evidence of his conviction would show nothing other than that he is of bad character and is a person likely to commit a crime. If Rivera had been on trial, then the Commonwealth could not have used such evidence against him except to impeach his credibility if he takes the stand. I cannot agree that the circumstantial evidence against Rivera is equal to or greater than the circumstantial evidence against the defendant.

The defendant cites *Hines v. Commonwealth*, 136 Va. 728 (1923), and *Karnes v. Commonwealth*, 125 Va. 758 (1919), as authority for allowing such evidence. In both of those cases, there was some connection between the victim and the alleged third party. Here there was no evidence of any drug involvement by the victim. There was no evidence that Rivera may have been aware that money or valuables were in the Evans-Smith house. The evidence at trial from Rivera and his wife at the time of the offense was a lack of any money problems. Any prior inconsistent statements only affect credibility and are not evidence of the truth of what was said. Even if one does not believe Rivera and his then wife, it would be sheer speculation of the extent, or even the existence, of a money problem.

The defendant argues that he should have been permitted to introduce evidence of the conviction to show an inadequacy in the police investigation. A deficient investigation may result in a lack of sufficient evidence or inadmissible

evidence, but I do not feel that a deficient investigation is a defense to a crime so as to allow the defendant to have admitted in evidence all the information that the police had or should have known during the investigation. Such evidence must be admissible under the rules of evidence.

The conviction evidence (which includes evidence of the charge, the conviction, and the statements made at sentencing) was not probative of motive to kill Barbara Evans-Smith. Its prejudicial effect on the Commonwealth outweighed any probative value it may have had for the defendant. Just because a certain fact may have been known to the police does not make it automatically admissible in evidence.

The defendant now argues that he should have been allowed to introduce evidence of a Loudoun investigator's help to Rivera when he was sentenced on the drug charge because it shows bias. Even if it were deemed that Rivera proved adverse, the defendant cannot attack his character or reputation for truthfulness by a prior conviction. *See* Friend, *Law of Evidence in Virginia* (3d ed. 1988). It would have been necessary to show the conviction in order to show the bias.

For all the foregoing reasons, the evidence of Rivera's conviction and related circumstances was not allowed in evidence. I am of the opinion that the ruling at trial was correct.

E. *Improper Argument and Conduct by the Commonwealth's Attorney*

1. *Improper Argument in Closing and Rebuttal*

All of the statements in closing argument by the Commonwealth's Attorney concerning the travelers on Route 725 that morning, the house being kept locked by Barbara Evans-Smith, and her waving good-bye to the defendant from the bedroom window were not misrepresentations, misstatements, or extravagant claims as asserted by the defendant. Each was a fair and proper argument by the Commonwealth's Attorney.

His statement that the blonde hair found on the steps "had fallen there" was completely consistent with

the testimony of Deanna Dabbs, a forensic scientist, that the hair "was consistent with having fallen out."

The Commonwealth's Attorney stated in rebuttal that there was one head hair found in the pubic combings of the victim that had been forcibly removed, and it was consistent with the defendant's hair. The only testimony concerning scientific analysis of hairs was that of Ms. Dabbs. She did not testify that any hair consistent with the defendant's hair was found in the pubic combings. Despite the defendant's argument in his memorandum (see page 24 thereof) about defense counsel's vehement objection to the "forcibly removed" comment, the matter of most concern to defense counsel at the bench conference after the objection was made was the reference to hair found in the pubic combings. Defense counsel did not ask for a mistrial or a curative instruction. After the bench conference, the Commonwealth's Attorney told the jury that the head hair was found in the pubic area, and he correctly stated that it was the joint recollection of jurors that controls. The transcript of the bench conference is not complete, but it is my distinct recollection that defense counsel did not object to the Court's suggestion that the Commonwealth's Attorney correct his statements. There was no further objection made even though no mention was made by the Commonwealth's Attorney after the bench conference as to the "forcibly removed" statement he had previously made.

The defendant's allegations concerning statements made about blood found on the victim's "throat" are now moot because the transcript has been corrected to show that the Commonwealth's Attorney said "robe," and not "throat."

### 2. Statements in Opening Concerning Evidence Never Admitted During Trial

The Commonwealth's Attorney made statements in his opening concerning an alleged extramarital affair of the defendant and some guns of the defendant. Evidence on both of these subjects was not admitted during trial.

The jury was instructed by the Court prior to opening statements that it was their duty to determine the facts from the evidence and all reasonable inferences therefrom,

and that what the attorneys may say is not evidence. The jury is to follow the instructions of the Court, and it must be assumed that they do so.

Considering the vast amount of evidence presented during the trial, I fail to see how the defendant might have been prejudiced by the statements concerning the guns. As to the statements in opening about the extramarital affair, defense counsel quite pointedly brought it to the attention of the jury, in closing argument, when he emphasized the lack of evidence as to the alleged affair. It was used to show weakness in the Commonwealth's case. At no time did defense counsel request a cautionary instruction.

When the statements were made in opening, the Commonwealth's Attorney had reason to believe that such evidence would be admissible because it was admitted at the first trial without objection by the defendant. The evidence was objected to by the defendant in this trial. Considering how the case was tried by defense counsel, I cannot find that such statements prejudiced the defendant to the extent that a new trial should be awarded.

### 3. *Failure to Properly Instruct Witnesses Not to Communicate with Other Witnesses or Mention the Prior Trial*

The matters of communication by Commonwealth witnesses with other witnesses were thoroughly inquired into by the Court when brought to its attention during trial. With respect to Sheriff Isom, after an *in camera* proceeding, the Court admonished him not to discuss the case with anyone else until it was concluded. Defense counsel agreed with the admonishment and did not object further or request any further sanctions or relief. As to Investigator Brown, the Court, after a hearing in open Court, similarly admonished him after finding that he had not discussed the case with other witnesses. Again, there was no further objection or request for further relief from defense counsel.

Sheriff Isom did testify on cross-examination that he had "been through this Court case one time." Counsel was instructed prior to trial to tell all witnesses to refer to the prior trial as a prior hearing. The Court

wished to avoid having the jury hear the word "trial," but it is certainly reasonable to assume that most, if not all, of the jurors had a pretty good idea by the time that Sheriff Isom testified that this case had previously been in Court for some reason. Both the Commonwealth's Attorney and defense counsel had been utilizing transcripts from the prior trial while at the podium in questioning witnesses. The jurors were not close enough to read the transcripts but were close enough to tell that they were transcripts. Sheriff Isom did not say "trial." The answer he was giving was responsive to the question posed by defense counsel. I cannot find that Sheriff Isom deliberately inserted the comment. Given the four years between the date of the offense and the time of trial, a juror could certainly believe that the Sheriff had to have been involved in some prior Court proceeding. Further, the numerous references to "prior hearing" during the trial in response to questions by *both* the Commonwealth's Attorney and defense counsel diluted the effect of the Sheriff's comment. I cannot see that much difference between his comment and "prior hearing" used by other witnesses and counsel.

The rule on exclusion of witnesses was not violated by the conduct of Sheriff Isom or Investigator Brown. The purpose of the rule is to prevent a later witness from shaping his testimony to correspond to earlier testimony in the case. The rule is aimed at the witness who has not yet testified. Sheriff Isom and Investigator Brown had already testified when their alleged improprieties occurred. They were not called to testify thereafter. *See,* Friend, *supra,* Section 13.

All of the alleged misconduct by the Commonwealth's Attorney does not warrant the granting of a new trial.

F. *Failure to Grant Mistrial During Testimony of Sheriff Isom*

For the reasons set forth above, I am of the opinion that there was no error in failing to grant a mistrial because of Sheriff Isom's comments about having "been through this Court case one time."

The defendant also contends that the comment of Sheriff Isom and the necessity for repeated references

to the prior proceedings and transcripts had the effect of prejudicing the defendant by informing the jury of a prior trial or causing them to infer an attempt to conceal information from the jury. I do not agree. Defense counsel engaged in numerous references to what a witness said at the "prior hearing." Defense counsel did not express any concern to the Court before or during trial about repeated references to a "prior hearing." Both the Commonwealth and defense counsel knew that each side would utilize the transcript of the prior trial if a witness testified differently than at the prior trial. If there was any prejudice to the defendant by such references to the proceedings, then there was also prejudice to the Commonwealth, and both the Commonwealth and the defense engaged in the same conduct. The defendant cannot complain of prejudice resulting from a trial tactic which he also utilized.

## G. *Conclusion*

For all the reasons set forth above, the Motion to Set Aside the Verdict is denied in its entirety.

### II. *Motion for a New Trial Based Upon Alleged Juror Misconduct*

On May 25, 1989, the defendant filed a motion requesting the Court to investigate the responses given to *voir dire* questions by three jury panel members. Attached to the motion were affidavits of two defense-employed private investigators, Robert Puglisi and M. Morgan Cherry, concerning interviews with jurors Paul Michael, Judith Davis, and Robin Grimm conducted after the completion of the trial. Based on the affidavits, which raised the possibility of juror misconduct, the Court granted the motion and conducted a hearing on June 13, 1989, at which time the three jurors and Mr. Puglisi testified. After the presentation of the evidence and argument of counsel, the defendant moved the Court for a new trial based on alleged juror misconduct.

The following findings are made based upon the evidence presented at the hearing. The affidavits served only as a basis for determining that a hearing should be held. Any statement of a juror made to a private investigator was

received as either a prior consistent or inconsistent statement affecting the juror's credibility. Also, I must consider that the private investigators were retained by the defense and approached each juror unannounced with a definite purpose. Although the interviews were admittedly taped by the private investigators, no transcripts or the recordings themselves were offered by the defendant. Also, I cannot ignore the admonition given in adultery cases that the testimony of private investigators should be received with great caution. I feel the same should apply where a defendant is attacking the sanctity of a jury verdict.

A. *Juror Paul Michael*

During *voir dire*, Mr. Michael stated that he had not acquired any information about the alleged offense or the defendant from the news media or any other source. When asked if he had heard of the case from newspaper reports, television reports, or discussion of friends, he replied, "I don't believe so, no." He said he was not sensible of any bias or prejudice against the Commonwealth or the defendant. Defense counsel stated at the end of *voir dire* of Mr. Michael, "[w]e have no issue with this gentleman," and he was not challenged for cause by the defendant.

As the evidence was presented during the trial, Mr. Michael remembered that there had been a murder in Loudoun County and someone had killed his or her spouse. He did not remember the details. He had no independent recollection of a murder in Loudoun County or that someone killed his or her spouse at the time he answered the *voir dire* questions. At the hearing, he stated, "I honestly did not know anything about this case," and when asked by the Commonwealth's Attorney if there was anything he remembered during the trial that would have affected his ability to sit fairly and impartially, he responded, "No, sir. I went solely on the evidence and testimony, and that's it."

In his affidavit and during his testimony, Mr. Puglisi said that when he asked Mr. Michael how he could equate what he had heard before the trial with what he heard in the courtroom, he responded that "it was the strangula-

tion thing." At the hearing, Mr. Michael said he did not remember saying this, but he did not deny it either.

Mr. Michael did not inform the Court or counsel during the trial of what he had remembered.

### B. *Juror Judith Davis*

During *voir dire*, Ms. Davis answered in response to the Court's question as to her acquisition of any information about the offense or the defendant: "Only from what I've read in the paper and that was quite some time ago." She said that the information would not affect her impartiality, and she had not arrived at any opinions or conclusions with respect to this case. When questioned by defense counsel as to her prior knowledge, she stated that:

1. she read it in the Loudoun *Times-Mirror*;
2. the details were "very sketchy at best";
3. she remembered as to the details only "something about his occupation" and "about some place downtown."

She had no other recollection of any other details or any prior proceedings. Ms. Davis was not challenged by the defendant on the basis of her prior knowledge.

Based on her testimony at the hearing, Ms. Davis did know during *voir dire* that the defendant was "employed downtown" and that "his wife had been murdered." As the evidence was presented during the trial, she remembered more about what she had read, but she cannot remember exactly what she had read. She could say only definitely that she had read something before about strangulation by pantyhose. She was not sure of having read before about the tire tracks, Robert Rivera, or the extramarital affair. Ms. Davis did not inform the Court or counsel that she recalled certain things during the course of the trial.

At the hearing, Ms. Davis identified an April, 1985, Loudoun *Times-Mirror* article that she thought she had read.

Ms. Davis said that there was nothing that she remembered during the course of the trial that she may have read before that would have affected her ability to sit fairly and impartially as a juror in this case.

In his affidavit and testimony at the hearing, Mr. Puglisi said that when he asked Ms. Davis if any of the

jurors had been exposed to news, television, or may have had something in the back of their minds concerning the case, she said, "Well, I could be one of those." But she said unequivocally at the hearing that she was merely referring to what she knew at *voir dire* and the answers she gave to the questions posed to her at that time. She knew it was a retrial because of the numerous references to prior testimony and proceedings during the trial, but she did not know that the defendant had been previously convicted until after this trial was concluded.

In answer to a question by defense counsel at the hearing, Ms. Davis may have seemed to indicate that there were things she read or heard about the case before she sat as a juror but which were not presented in the Court-room, but defense counsel did not pursue this issue. How-ever, her answers to further questions by the Court on the subject show that she was only thinking of the extra-marital affair and that it was first mentioned to her by a co-worker after the conclusion of the trial. She said that she was not aware of the extramarital affair until after the trial. The jurors may have wondered why Ms. Bunge was recognized by the Court as a witness but did not testify, but there was nothing presented to indicate that any of the jurors associated her with the extramarital affair.

As an aside from matters pertaining specifically to Ms. Davis, it must be noted that during trial just after the Court made its ruling excluding testimony of the extramarital affair, the Commonwealth asked the Court to recognize Ms. Bunge because the Commonwealth's out-of-state witness certification for her had or was about to expire. The Court specifically asked defense counsel if they wished this to be done outside of the presence of the jury. In response, defense counsel did not object to it being done in the presence of the jury.

## C. *Juror Robin Grimm*

During *voir dire*, Ms. Grimm was asked by the Court, "[h]ave you or any member of your family ever been engaged in law enforcement work?" She answered, "No, sir." She

stated that she served in the Army for three years attaining the rank of E-4 when she was discharged.

While she was in the Army, Ms. Grimm had been an "administrative specialist" in the Criminal Investigations Division (CID) at Fort Meade. Her description of the job was that she was basically a secretary, a driver for generals, a mail clerk, a word processor, and that she mowed grass. She was not involved in any criminal investigations, she did not assign investigators, and she had no military police training. She never discussed a case with an investigator. Being the mail clerk, she had to open envelopes to see that the contents went to the correct person. She only saw criminal evidence as it came through the mail room and then only to see that it went to the correct place. She only saw final investigation packages and never was involved in any on-going investigation.

During *voir dire*, it did not occur to Ms. Grimm at all that her duties at CID had anything to do with the question concerning law enforcement work. She was, in her own words, "just a clerk, just, you know, more or less a secretary and a catch-all, I didn't really think that was very important."

Ms. Grimm did not bring her duties at CID to the attention of the Court or counsel during the trial. She stated that there was nothing in her prior military training or service that would have affected her ability to sit fairly and impartially as a juror in this case.

There was no evidence presented at the hearing that indicated in any way that any of the three jurors told the other jurors of their prior knowledge, except that Ms. Grimm might have told one or more jurors that she "was military." None of the three jurors indicated that they jury had considered or heard any evidence or information outside of what was presented during the trial.

When asked on *voir dire* if any of the three aforesaid jurors knew any reason whatsoever why they could not give the defendant a fair and impartial trial based solely on the law and the evidence, they all responded in the negative.

D. *Application of Law and Conclusions*

Certainly a defendant in a criminal case is entitled to be tried by an impartial jury. U.S. Const. Amends. VI and XIV; Virginia Const. Art. I, Section 8. However, at the same time, it is virtually impossible to have a juror that is shielded from every influence or contact that might affect his decision. Due process means a jury capable and willing to decide the case solely on the evidence before it coupled with a trial judge preventing prejudicial occurrences and to determine the effect of such occurrences if and when they happen. *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 946 (1982). *Voir dire* as a safeguard for jury impartiality is not infallible, and, at the same time, due process does not require a new trial every time a juror is placed in a potentially compromising situation. *Id.* at 946. If that were the rule, few trials would be constitutionally acceptable. It is a time-honored maxim that a defendant is entitled to a fair trial, not a perfect one, for there are no perfect trials. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845, 848 (1984); *Brown v. United States*, 411 U.S. 223, 93 S. Ct. 1565, 1570 (1973). Nor is a defendant entitled to a panel of jurors who are wholly ignorant of the case. *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639 (1961); *Raulerson v. Wainwright*, 753 F.2d 869 (11th Cir. 1985); *Justus v. Commonwealth*, 220 Va. 971 (1980). *Also see L. E. Briley v. Commonwealth*, 222 Va. 180 (1981).

I cannot agree with the defendant's contention that it is not necessary to show bias or prejudice resulting from the nondisclosure or concealment by the juror. I cannot agree that the juror disclosure required in Section 8.01-358 gives the defendant a new trial automatically if a juror concealed information. The statute in my opinion applies to a juror who actually knows something as opposed to a juror who has heard or read or been told something about the case. Except for the District of Columbia cases and possibly one California case cited by the defendant, all cases cited by counsel show that there must be some connection between the concealment or other juror impropriety and the juror bias or prejudice.

In *Smith* the U. S. Supreme Court stated:

> This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.

102 S. Ct. at 945.

In *McDonough* the same Court stated:

> The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

104 S. Ct. at 850.

I feel that this is a similar standard to that set forth by our Court of Appeals in this case, when it stated:

> The test in a criminal case is not whether the jurors were actually prejudiced by the extraneous matter, but whether they might have been so prejudiced.

5 Va. App. at 207.

In other words, it is not a *per se* test, but a test of reasonableness. The Court of Appeals explained how the almanac information in the first trial might have prejudiced the jurors. It did not rule that just because a juror consulted an almanac and shared the information with the other members of the jury, the defendant is automatically entitled to a new trial. The reasonable possibility of prejudice had to be shown.

In *Briley*, the Virginia Supreme Court, following *Irvin v. Dowd*, held that the mere existence of any preconceived notion as to guilt or innocence without more is insufficient to rebut the presumption of a prospective juror's impartiality. It is sufficient if a juror can set aside his impression and render a verdict based on the evidence presented in Court. 222 Va. at 186. Also, in *Mullis v. Commonwealth*, 3 Va. App. 564 (1987), the Virginia Court of Appeals held that whether a juror should be excused for cause should be decided upon a review of the entire *voir dire* and not just on the answer to one isolated abstract question of whether a juror would tend

to believe a police officer as opposed to a private citizen. 3 Va. App. at 572.

Although counsel has not cited and I have not found a Virginia case directly on point, I am of the opinion that in light of the two Virginia cases referred to above and the Virginia Supreme Court decision in *Clozza v. Commonwealth*, 228 Va. 124 (1984), bias or prejudice must be shown in order to entitle the defendant to a new trial.

> A prospective juror is not subject to automatic exclusion because of an association with law enforcement personnel, provided the juror has no knowledge of the facts of the case and *demonstrates impartiality* toward the parties. (emphasis mine).

228 Va. at 129.

Assuming that the concealment does not constitute grounds for challenge for cause, the failure to accurately answer a *voir dire* question does not deprive the defendant of information needed to exercise his peremptory challenges. *United States v. Fryar*, 867 F.2d 850 (5th Cir. 1989).

Although there may be jurisdictions to the contrary, I am of the opinion that the majority and better view is that there must be some nexus between the concealment or impropriety of the juror and the juror bias or prejudice against the defendant. The Virginia Supreme Court has recognized that the decision of the trial judge who had the opportunity to observe the prospective jurors on *voir dire* is entitled to much deference. *Smith v. Commonwealth*, 219 Va. 455, 464-465 (1978). The same should apply to a hearing on alleged juror misconduct. With these principles in mind, I will address the circumstances involved with each juror.

### 1. *Juror Paul Michael*

At most, Mr. Michael recalled for the first time during the trial that sometime prior to the trial, he had acquired information that there had been a murder in Loudoun County and someone had killed his or her spouse. The former was an undisputed fact at trial, and the latter was not connected to the defendant by Mr. Michael. He

recalled no other details of the case. He did not even say that what he remembered was specifically applicable to this case. He did not even know what spouse had done the killing. Mr. Michael honestly did not recall anything at all about the case during *voir dire*. The little that he remembered during the trial does not tend to show any partiality on his part. His reason for his answers on *voir dire* were honest. He just did not remember at that time.

Mr. Michael's recollections during the trial are very general and nebulous. His recollections may not have even had anything to do with this case. The jury was instructed to decide the case based on the law and the evidence. Jurors are presumed to follow the instructions of the Court. *See, Raulerson*, 753 F. 2d at 876.

A mere showing of the possibility of prejudice is not enough. *United States v. Barber*, 668 F.2d 778 (4th Cir. 1982).

I cannot find that Mr. Michael, based on what he remembered during the trial, was biased or prejudiced against the defendant, and I cannot find that his decision as a juror was based on anything other than the evidence presented at the trial.

## 2. Juror Judith Davis

Considering all the evidence presented, I cannot find that Ms. Davis knew any more during the course of the trial than she revealed on *voir dire*. She may have recognized the *Times-Mirror* article at the hearing, but that does not prove that she had all the information set forth therein in her mind as she sat as a juror. It is common knowledge that human beings do not remember all that they read. The possibility of her remembering it is not enough. I am constrained to believe what Ms. Davis testified to under oath.

It is obvious to the Court that Ms. Davis read and discussed this case after the trial was concluded. She was not definite in stating when she read and/or discussed the extramarital affair, the tire tracks, Robert Rivera, or the pantyhose. It is most telling that when asked what things she read or heard before that did not come out during the trial, all she mentioned was the extramarital

affair, but when she was pursued on the point by the Court, she admitted that it came up after trial. She specifically denied any knowledge of the extramarital affair during the trial.

The defendant argues that if Ms. Davis had answered on *voir dire* as she did at the hearing, then she would have been excused for cause. This is an inappropriate argument because at *voir dire* she had not yet heard the evidence and was not shown the newspaper article. Defense counsel was not in any way prevented by the Court from exploring the extent of Ms. Davis' knowledge at *voir dire*. Further, it would have been objectionable to have shown Ms. Davis the newspaper article on *voir dire*.

Even if Ms. Davis did remember something about the tire tracks, Robert Rivera, or the pantyhose during the trial, the defendant did not elicit from her the details of each subject. There was evidence presented on all three subjects at trial. If what she remembered is the same as the evidence at trial, then how is the defendant prejudiced? Likewise, to find that the specifics were different would be sheer speculation. Possibility of prejudice is not enough. The sanctity of a jury verdict should not be attacked and the verdict set aside on speculation or possibility of prejudice.

Ms. Davis answered the *voir dire* questions honestly. While there may be some impropriety on her part in not coming forward during the trial to indicate what she started to remember, I cannot find her decision to be dishonest or an indication of her bias or prejudice against the defendant. There is nothing to support a finding that her decision as a juror was based on any evidence or information outside that presented in the court room.

### 3. *Juror Robin Grimm*

The language of the question posed to Ms. Grimm on *voir dire* concerning law enforcement work was developed by and requested by the defendant. The crucial words are "engaged in law enforcement work." As Ms. Grimm explained her duties while with CID in the Army, she could easily and reasonably have felt that she was not engaged in law enforcement work. As asked, she could have reasonably felt that it only applied to a person actually enforcing

the law, such as a military policeman or investigator, or someone with arrest powers or investigatory duties and powers. She did not have arrest powers or investigative duties. She was merely a secretary, clerk, driver, and performer of odd jobs. She was not asked if she was ever "involved with," "associated with," or "employed by" law enforcement. A juror cannot be expected to answer a question not posed to him or her. Further, I feel that this situation is very close to that found in *Clozza*. Her CID duties would not have given rise to a challenge for cause. There has been no showing whatsoever that Ms. Grimm was aware of any of the facts of the case or that she was not impartial.

As it was asked, Ms. Grimm answered the question fairly and honestly. If the question is entitled to more than one reasonable interpretation, then it is not grounds for a new trial just because the juror interpreted the question differently from defense counsel. *See United States v. Fryar*, 867 F.2d 850 (5th Cir. 1989), where a new trial was denied even though a juror concealed a DWI conviction when asked if he had ever been convicted of a crime. Just as that juror felt DWI was not a crime, Ms. Grimm felt that she was not engaged in law enforcement work.

No bias or prejudice has been shown on the part of Ms. Grimm. I cannot find that her duties while in the Army with CID made her biased or prejudiced against the defendant.

All three jurors stated specifically at the hearing that there was nothing that any of them had read or heard or experienced before the trial that affected their impartiality. There was no showing of any improper motive for concealment by any of the three jurors. While there may be some dispute that "inferred bias" or "implied bias" can exist regardless of what the juror or other evidence may say about a juror's impartiality, I feel that such bias could exist in an appropriate case. For example, see Justice O'Connor's concurring opinion in *Smith*, 102 S. Ct. at 948. Considering those examples, I am of the opinion that none of the alleged improprieties by the three jurors in this case rises to the level of "inferred" or "implied bias."

For all the foregoing reasons, the motion for a new trial based on juror misconduct is denied. Further, I am of the opinion that the defendant received a fair trial in this case.